UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FIRST COAST ENERGY, L.L.P.,

       Plaintiff,

v.                                  CASE NO. 3:12-cv-281-J-32MCR

MID-CONTINENT CASUALTY COMPANY,

       Defendant.

_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Plaintiff First Coast Energy, L.L.P.'s

("First Coast," "FCE," or "Plaintiff") Amended Renewed Motion for Sanctions

Including Default Judgment ("Renewed Motion for Sanctions") (Doc. 145),

Defendant Mid-Continent Casualty Company's ("Mid-Continent," "MCC," or

"Defendant") Response thereto ("Response") (Doc. 154), and Plaintiff's Reply to

Defendant's Response ("Reply") (Doc. 162), filed pursuant to the Court's January

8, 2015 Order (Doc. 161).  For the reasons that follow, it is respectfully

**RECOMMENDED** that the Renewed Motion for Sanctions be **GRANTED**.

---

[1] "Within 14 days after being served with a copy of [this Report and Recommendation], a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); M.D. Fla. R. 6.02(a).  "A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).

## I.      Relevant Background

This is an action for first-party insurance bad faith pursuant to section 624.155 of the Florida Statutes, after a final judgment entered in state court finding coverage following Defendant's denial of a claim for clean-up costs for petroleum contamination at one of Plaintiff's gas stations.  (Doc. 3.)  Amended final judgment was entered in Plaintiff's favor on January 26, 2012, after the First District Court of Appeal affirmed the trial court's determination of liability against Defendant and issued its mandate on November 2, 2011.  (Doc. 120 at 2; Doc. 127 at 4.)

On January 27, 2012, Plaintiff filed this action in state court.  (Doc. 3.)  On March 14, 2012, Defendant removed the action to this Court.  (Doc. 1.)  On June 8, 2012, the Court entered a Case Management and Scheduling Order setting January 11, 2013 as the discovery deadline.[2]  (Doc. 13.)

On August 28, 2012, Plaintiff served its First Request for Production and First Set of Interrogatories on Defendant.  (Docs. 145-1, 145-2.)  On October 11, 2012, Defendant responded to the discovery requests, with some objections. (Doc. 154-1.)  On October 22, 2012, Plaintiff filed a motion to compel discovery (Doc. 16), which the Court granted in part and denied in part on November 20,

---

[2] The discovery deadline was subsequently extended several times and finally it was set for September 16, 2014.  (Doc. 137.)  On June 9, 2014, the Court entered an Order striking the final pretrial conference set for June 23, 2014 and the trial set for the term commencing July 7, 2014, and stating that new dates will be set as appropriate.  (Doc. 123.)

2012 (Doc. 18).  The Court directed Defendant to produce documents responsive to Plaintiff's First Request for Production by December 3, 2012.  (*Id.*)  On December 3, 2012, Defendant served its Second Amended Response to Plaintiff's First Request for Production.  (Doc. 154-2.)

On April 24, 2013, Plaintiff again moved to compel Defendant's responses to Plaintiff's First Request for Production.  (Doc. 45.)  On May 15, 2013, the Court granted the motion in part and required production, no later than May 24, 2013, of any documents previously withheld on the basis of work product contained in either the claims files at issue in this case or any other insureds' claims files, which relate to and/or illuminate the manner in which Defendant handles other pollution liability and environmental damage claims in the general course of business.  (Doc. 54.)  Further, the Court directed Defendant to provide the Court and Plaintiff with a revised privilege log referencing the documents being withheld on the basis of the attorney client privilege and to hand deliver the documents to chambers for an *in camera* inspection no later than May 30, 2013.  (*Id.*)

On May 29, 2013, Defendant filed an Objection to the Court's May 15, 2013 Order, which the Court construed as a motion for reconsideration.  (Doc. 57.)  On October 1, 2013, Defendant served its Second Supplemental Response to Plaintiff's First Request for Production.  (Doc. 154-5.)  On November 1, 2013, the Court entered an Order, granting in part Defendant's motion for reconsideration of the Court's May 15, 2013 Order, and directing Defendant to produce, no later than

3

November 22, 2013, the information required by the Court's May 15, 2013 Order,
except information contained in files where coverage has not yet been determined.
(Doc. 76.)  On November 22, 2013, Defendant served its Third Supplemental
Response to Plaintiff's First Request for Production, along with a Revised Claim
File Privilege Log, as directed by the Court's November 1, 2013 Order.  (Doc. 154-
6.)  On December 3, 2013, the Court upheld Defendant's assertions of privilege.
(Doc. 79.)

On January 23, 2014, the Court held a final pretrial conference, during which
defense counsel stated, *inter alia*, that Defendant "inadvertently" did not produce
all documents.  (Doc. 145-3 at 5 (Tr. 16:21-22).)  While preparing exhibit lists for
trial, Plaintiff's counsel noticed Defendant had produced electronic claim notes for
another claim.  (Doc. 154-7 at 3.)  On April 23, 2014, Plaintiff's counsel asked
Defendant's counsel to confirm that similar notes did not exist for the instant claim
because none had been produced.  (*Id.*)  On April 25, 2014, Defendant's counsel
responded that the entire claim file had been re-reviewed and that claim notes did
not exist.  (Doc. 145-4.)

However, on May 12, 2014, Defendant served its Fourth Supplemental
Response to Plaintiff's First Request for Production, 57 pages of redacted claim
notes, and an Amended Claim File Privilege Log.  (Doc. 154-7.)  In an e-mail to
Plaintiff's counsel that day, Defendant's counsel stated that the electronically
maintained claim notes "were inadvertently omitted from the claim file provided"

4

earlier.  (*Id.* at 2.)  On May 16, 2014, Defendant served its Verified Supplemental Responses to Plaintiff's First Set of Interrogatories.  (Docs. 145-5, 154-4.)

On May 20, 2014, Plaintiff moved to compel production of unredacted claims notes that Defendant withheld from its Fourth Supplemental Response to Plaintiff's First Request for Production on grounds of privilege, or, alternatively, for an *in camera* inspection and a more definite privilege log.  (Doc. 120.)  Plaintiff also filed a Motion for Sanctions, for Continuance of the Trial, and to Reopen Discovery.  (Doc. 119.)  On July 17, 2014, the Court entered an Order granting the motion to compel and the motion for sanctions.  (Doc. 129.)

In granting the motion to compel, the Court's July 17, 2014 Order directed Defendant to provide, no later than July 31, 2014, a revised privilege log and to hand deliver to chambers the claim notes generated after January 26, 2012 for an *in camera* inspection.  (*Id.* at 6.)  The Order also directed Defendant to provide, no later than July 24, 2014, any claim notes generated between September 28, 2010 and January 26, 2012, which had not been produced as of the date of the Order. (*Id.* at 7.)

In granting the motion for sanctions, the Court observed:

First, the relevance and importance of the subject claim notes to Plaintiff's case is undisputed.  Further, when Plaintiff received these notes, the discovery period had already closed and the trial term was only twenty days away.  Under these circumstances, the potential prejudice to Plaintiff cannot seriously be disputed.

(*Id.* at 12 (footnote omitted).)  Further, the Court stated:

5

Defendant attempts to establish, through Mr. Jordan's Affidavit, that its untimely production was the result of an inadvertent oversight and was therefore substantially justified.  However, the Court is unprepared to reach such a conclusion without the benefit of additional targeted discovery, particularly in light of the Court's May 15, 2013 Order, which not only addressed the same discovery that is at issue here, but also gave Defendant another opportunity to diligently search for and produce any relevant claim notes at a much earlier stage of the case.  Therefore, Plaintiff will be given an opportunity to depose Defendant's witness(es) regarding the production of the subject notes.  Plaintiff will also be allowed to depose Defendant's witness(es) as to the substantive contents of those notes. . . .  Although the Court will not assess any monetary sanctions at this time, upon completion of this discovery, Plaintiff may renew its request for sanctions, if necessary.  All discovery permitted by this Order must be completed no later than September 2, 2014.

(*Id.* at 12-13 (emphasis omitted).)[3]

On July 24, 2014, Defendant served its Fifth Supplemental Response to Plaintiff's First Request for Production, producing additional electronic claims notes.  (Doc. 154-8.)  On July 31, 2014, Defendant served a Revised Claim File Privilege Log, as directed by the July 17, 2014 Order.  (Doc. 132.)  On August 5, 2014, the Court found the privilege log to be inadequate and directed Defendant to provide a further revised privilege log no later than August 11, 2014, which Defendant did.  (*Id.*)

On August 13, 2014, after an *in camera* inspection of Defendant's claim notes and privilege log, the Court directed Defendant to produce some of the

---

[3] The discovery deadline was subsequently extended to September 16, 2014.  (Doc. 137.)

notes previously withheld on privilege grounds, and to further revise its privilege log with respect to claim notes generated after January 26, 2012.  (Doc. 135.)  On September 8, 2014, after an *in camera* inspection of the claim notes generated between January 30, 2012 and May 1, 2014 and a review of Defendant's further revised privilege log, the Court directed Defendant to produce additional claims notes previously withheld on privilege grounds, no later than September 12, 2014.  (Doc. 138.)

Pursuant to the Court's July 17, 2014 Order, between August 11, 2014 and September 11, 2014, Plaintiff conducted five witness depositions and re-deposed Defendant's expert.  One of the deposed witnesses was Defendant's corporate representative Jack Jordan.  (Doc. 145-3 at 7-16.)  In his earlier affidavit, Mr. Jordan represented that the separate task of printing the electronic claim notes for the underlying claim at the outset of this matter was an apparent oversight.  (*Id.* at 9.)  At his August 11, 2014 deposition, Mr. Jordan testified that he did not know why the electronic claim notes had not been produced.  (*Id.* at 9-10.)  He stated that although the electronic claim notes are part of the electronic claim file, they cannot be put on a disc and would need to be printed.  (Doc. 154-13 at 5-6, 8.)  He assumed that either the electronic claim notes had not been printed initially, or they had been printed and sent under a separate cover, or they had been sent to defense counsel who must not have seen them.  (Doc. 145-3 at 8.)  Mr. Jordan also testified that in September of 2012, it was possible to print the electronic claim

notes.  (*Id.* at 11-12.)  Mr. Jordan further testified that the electronic claim file was searchable to the extent it was possible to break it down into categories, such as correspondence, investigation, photos, legal pleadings, and sub-files, such as reservation of rights.[4]  (*Id.* at 13-14.)

On August 12, 2014, Plaintiff took the deposition of Defendant's Home Office Supervisor Frank Pope.  (*Id.* at 36-46.)  Mr. Pope testified, *inter alia*, that when a request is made to put a claim file on a disc, the disc would not include the claim notes because the claim notes would need to be printed.  (*Id.* at 38.)  On August 13, 2014, Mr. Pope inspected MCC's Home Office for any coverage files separate and distinct from the electronically maintained claim files for FCE claims 3026, 3040/2015, 3011, and 2002.  (Doc. 145-15 at 7.)  His inspection revealed that no such files exist.  (*Id.*)

On August 21, 2014, Plaintiff took the deposition of Defendant's now retired employee Patrick Elwood.  (Doc. 145-3 at 18-34.)  Mr. Elwood testified that he was not aware of any set procedure at MCC for responding to requests for production of documents in a lawsuit.  (*Id.* at 22.)  Mr. Elwood further testified that for purposes of responding to Plaintiff's document request, he did not inquire if anyone at the home office had any responsive documents.  (*Id.* at 24.)  When asked if he looked at the disc that the IT department prepared to make sure it had

---

[4] This is consistent with both Mr. Elwood's and Mr. Pope's deposition testimony. (Doc. 145-3 at 29-30, 39-40.)

captured everything in the claim file before sending it to defense counsel, Mr.

Elwood responded:

> I am sure I looked at it briefly, but . . . [t]here is no way that I went
> through each and every one and matched them.  I have to trust if [sic]
> they took everything off the system and put it on the disk,
> electronically, I don't know how it could not be the same.

(*Id.* at 26-27.)  Additionally, Mr. Elwood testified that he did not print out the

electronic claim notes and did not send them to counsel.  (*Id.* at 32.)

On September 8, 2014, Plaintiff's counsel wrote an e-mail to defense

counsel, opining that "no reasonable and diligent effort was made to respond to

[Plaintiff's] various discovery requests" and stating, *inter alia*, that Plaintiff's counsel

had "located a number of additional claims where coverage was denied, that were

not listed in response to [Plaintiff's] interrogatories requesting such information."

(Doc. 145-6 at 2.)  The e-mail further stated: "It is frankly not our job to discover

what has not been produced but the job of you and your client to be sure that all

responsive documents have been searched for and produced and all answers to

interrogatories are complete and correct."  (*Id.*)

On September 9, 2014, defense counsel responded by e-mail, stating that

he would ask his client to look for the documents identified in depositions if Plaintiff

identified those documents.[5]  (*Id.* at 4.)  The e-mail also provided:

> As for claims manuals or guidelines, Jack [Jordan] has again assured

---

[5] Plaintiff represents that it provided the documents on September 17, 2014.

me no such manuals or guidelines exist.  You claim vaguely that manuals and guidelines were produced by MCC in other cases.  Tell me what cases you are referring to, and better yet, if you have any such manuals or guidelines please send them to me. . . . All electronic claim notes, i.e., those that were not scanned originally and those that were, have already been produced to you.

(*Id.*)

On September 25, 2014, Defendant served its Sixth Supplemental Response to Plaintiff's First Request for Production, producing 380 pages of documents from its claim file that were generated between September 28, 2010 and January 26, 2012, and a further revised claim file privilege log, identifying additional documents withheld from discovery.  (Doc. 145-7.)  On October 24, 2014, Defendant served its Second Supplemental Verified Answers to Plaintiff's First Set of Interrogatories, revising its response to Interrogatory No. 7 to identify, for the first time, 589 policies and claim numbers where it had allegedly accepted coverage.  (Doc. 145-8.)

On October 29, 2014, Defendant served its Seventh Supplemental Response to Plaintiff's First Request for Production, producing approximately 498 pages of additional documents.  (Doc. 145-9.)  On November 4, 2014, Defendant served its Eighth Supplemental Response to Plaintiff's First Request for Production, producing 745 pages of additional documents.  (Doc. 145-10.)  On November 7, 2014, Defendant served its Ninth Supplemental Response to Plaintiff's First Request for Production, producing over 3,000 pages of additional

documents.  (Doc. 145-11.)  On November 10, 2014, Defendant produced a copy of the EDS Document Production Request form generated in connection with Defendant's duplication of the underlying claim file at the outset of discovery. (Doc. 154-10.)

On December 17, 2014, the same day that Defendant filed its Response to the instant Motion, Defendant served its Tenth Supplemental Response to Plaintiff's First Request for Production, providing 746 pages of new documents. (Docs. 154-12, 162-1.)  Also on December 17, 2014, Defendant served its Third Supplemental Verified Answers to Plaintiff's First Set of Interrogatories, responding to Interrogatory No. 6, and disclosing 32 additional denied claims.  (Docs. 154-11, 162-1.)

## II.     Discussion

### A.     The Parties' Positions

#### 1.     Plaintiff's Arguments

Plaintiff asserts that "[t]he sanction of default is the only appropriate sanction based upon the egregious nature of the conduct in this action."  (Doc. 145 at 11.) Plaintiff states:

> [T]he sworn deposition testimony of Mid-Continent witnesses demonstrates that Mid-Continent willfully failed to undertake virtually any investigation to ensure its initial responses to First Coast's August 2012 Request for Production and First Interrogatories were complete. It was not until September of 2014, more than two years after the discovery was served and after several court Orders compelling

production of documents responsive to First Coast's First Request for Production, when Mid-Continent finally produced over 4,000 pages of documents critical to the prosecution of the case and disclosed 589 relevant claims in response to interrogatories. Mid-Continent's dilatory conduct is "plainly willful" and the prejudice to First Coast arising therefrom is clear.

(*Id.* at 11-12 (internal citations omitted).)

Plaintiff contends that the Affidavits of Patrick Elwood and Jack Jordan, filed by Defendant earlier in this action, "contained false and/or misleading statements apparently made in an attempt to make the burden upon First Coast to prosecute the claim more onerous and to obfuscate the discovery process."[6] (*Id.* at 12.) Plaintiff points out that although Mr. Elwood stated in his Affidavit that a physical search of each file would be necessary to respond to Plaintiff's discovery requests (Doc. 25-1 at ¶¶ 11-13), this statement was unsupported by subsequent deposition testimony. Further, although Mr. Jordan stated in his Affidavit that Defendant's failure to produce the electronic claim notes in 2012 was an apparent oversight (Doc. 121-1 at ¶ 16), his deposition testimony indicates that he does not know why the claim notes were not produced with Defendant's initial response to Plaintiff's First Request for Production (Doc. 145-3 at 9-10).

Plaintiff argues that the prejudice caused by Defendant's failure to timely produce the electronic claim notes is compounded by Defendant's failure to

---

[6] The Affidavit of Patrick Elwood was filed in support of Defendant's motion to determine discovery costs (Doc. 25-1). The Affidavit of Jack Jordan was filed in support of Defendant's response to Plaintiff's previous motion for sanctions (Doc. 121-1).

produce many other documents referenced in the claim notes or identified during

depositions until October and November of 2014.  (Doc. 145 at 16.)  Plaintiff

states:

> Mr. Elwood admitted that Mid-Continent does not have any procedure
> for responding to requests for production of documents in lawsuits. . .
> . Mr. Elwood did not take any steps to look at the documents that
> Mid-Continent's IT department had put on a disc to make sure they
> had captured everything in the claim file before sending the disc to
> counsel. . . . When the claim notes were finally produced more than
> two years later, had Mid-Continent or its counsel reviewed them, it
> would have been obvious that additional discoverable documents,
> some of which are referenced above, remained outstanding.

(*Id.* at 16-17.)

Plaintiff also argues that Defendant failed to accurately and completely

respond to Interrogatory Nos. 6 and 7 in violation of the Court's November 2012

Order.  (*Id.* at 17.)  More specifically, Plaintiff states:

> In response to Interrogatory No. 6, Mid-Continent failed to identify a
> number of claims that [Plaintiff's] counsel were aware of because they
> or other attorneys in the firm were involved in those lawsuits.  Several
> of the claims were defended by Mid-Continent's counsel in this case. .
> . .  Thereafter, counsel for First Coast's independent Westlaw
> research revealed additional claim numbers in public court records for
> claims which were denied and were not identified and listed by Mid-
> Continent.  Counsel for First Coast notified counsel for Mid-Continent
> in writing and orally about these additional claims.  Mid-Continent's
> counsel still failed to supplement Mid-Continent's answer to the
> interrogatory. . . .
> Mid-Continent initially answered Interrogatory No. 7 [asking about all
> storage tank claims], by reference to the answer to No. 6, thereby
> implying that it had not found coverage on any claim under the policy.
> Mr. Elwood, who executed the interrogatory answers on Mid-
> Continent's behalf, however, testified in deposition that Mid-Continent
> had in fact accepted coverage on some claims filed with it[.] . . . On

> October 24, 2014 – 787 days after the discovery was served – Mid-Continent served its Second Supplemental Response to Interrogatory No. 7, identifying – for the first time – 589 storage tank claims where it had presumably accepted coverage.  First Coast has, of course, been unable to conduct any discovery with respect to these claims or to use information gleaned as part of their coverage decisions in any depositions or expert analysis.

(*Id.* at 17-19 (internal citations omitted).)

In addition, Plaintiff argues that Defendant's failure to produce its training materials as to claims handling has impacted Plaintiff's decisions in litigating this action.  (*Id.* at 19-20.)  Although Defendant responded it does not possess such materials, Plaintiff's counsel's independent research has revealed that in another case, Defendant belatedly conceded that training materials did exist.  *See Signature Dev., LLC v. Mid-Continent Casualty Co.*, 2012 WL 4321322, *12 (D. So. Dakota Sept. 18, 2012) (ordering Mid-Continent to produce documents that it uses to teach or train its employees on how to adjust claims).  Further, one of Defendant's employees, George Chahalis, advised Mr. Pope on October 24, 2014 that "he does possess some non-MCC written/paper storage tank education and/or training and/or reference materials," and on the same day, he provided a copy of those materials to Mr. Pope who forwarded them to MCC's counsel.  (Doc. 145-15 at 19.)

According to Plaintiff, Defendant has shown a pattern and practice of discovery violations as this is not the first case involving these parties where Defendant has failed to produce responsive documents.  (Doc. 145 at 21.)  For

14

example, Plaintiff points to *First Coast Energy, L.L.P. v. Mid-Continent Casualty Company*, Case No. 16-2006-CA-1584, *31 (Fla. Cir. Ct. June 14, 2012), where the Circuit Court granted plaintiff's motion to set aside settlement agreement because, *inter alia*, "[t]he settlement was premised on incomplete discovery responses by MCC."  (Doc. 145-14 at 32.)  The Circuit Court found that "MCC did not provide FCE with the site specific portion of its renewal application until it produced the underwriting file on April 13, 2010, seven months after it purported to have produced the renewal application."  (*Id.* at 26.)  The Circuit Court further found that "[s]ince FCE was not provided with a complete renewal application, despite having asked for the document on a number of occasions, it could not have presented evidence regarding its disclosures and was unable to fully assert its claim."  (*Id.* at 31.)

Further, Plaintiff contends that since its prior motion for sanctions was filed in this case, "the testimony of Mid-Continent witnesses, the production of thousands of pages of documents in the last 30 days, and the failure to fully respond to discovery, lead only to the conclusion that Mid-Continent has willfully failed to produce pertinent discovery in this case."  (Doc. 145 at 22.)  Plaintiff argues that "[a]s Mid-Continent has previously been sanctioned to no avail, any sanction other than a default judgment would not serve as a deterrent for future conduct nor adequately ameliorate the harmful effects of its discovery abuses to First Coast." (*Id.*)

However, should the Court decline to enter a default judgment, Plaintiff submits that other sanctions are appropriate, including: (1) instructing the jury that Defendant failed to timely produce discovery and acted in bad faith in responding to discovery requests in this case, (2) reopening discovery to allow Plaintiff to follow-up on the information provided after August 2014 and directing Defendant to pay the fees and costs for re-deposing witnesses caused by its failure to produce documents, (3) resetting the expert disclosure deadline, and (4) awarding Plaintiff attorney's fees and costs associated with the motions to compel, motions for sanctions, and related to the investigation of Defendant's deficient discovery responses.  (*Id.* at 22-23.)

## 2.  Defendant's Arguments

Defendant responds the Renewed Motion for Sanctions should be denied because "there is absolutely no evidence whatsoever of any willful or bad faith failure by [Defendant] to obey any discovery order of this Court."  (Doc. 154 at 2.) Defendant argues that neither MCC nor its counsel had any reason to question the completeness of the claim file as duplicated at the outset of discovery.  (*Id.* at 11.) Defendant explains that because the EDS form at the outset of discovery provided that the file needed to be duplicated via "BURN TO CD," the claim notes, which could not be put on a disc, "were omitted by virtue of an inadvertent oversight as opposed to any willful or bad faith conduct by MCC."  (*Id.*)  Defendant contends it conducted an immediate and thorough investigation as follows:

16

MCC's counsel immediately conducted a re-review of the claim file in its possession which did not reveal the existence of claim notes in the form requested by FCE.  In an abundance of caution MCC's counsel contacted Jack Jordan at MCC who immediately undertook his own investigation.  The claim notes were promptly produced with a privilege log.  MCC complied with all subsequent discovery orders directing it to produce a very limited number of additional claim notes and revised privilege logs for the Court's *in camera* review(s). . . . In connection with its post-deposition investigation, MCC served supplemental responses . . . .

(*Id.* at 11-12 (internal citations omitted).)

Defendant asserts that its "failure to produce the electronic claim notes can be fairly characterized as 'simple negligence,'" and Plaintiff has suffered no prejudice because it has been afforded the opportunity to conduct extensive discovery.  (*Id.* at 13.)  Defendant states it "produced practically the entire claim file in the early stages of discovery."  (*Id.* at 15.)  Also, "[t]he items of discovery which FCE now contends 'compounded' its purported prejudice have been addressed by MCC by virtue of its recent supplemental discovery responses."  (*Id.* at 15-16.)  Defendant further states:

The only discovery outstanding at the time FCE filed the instant Motion was a further supplemental response to FCE's Interrogatory No. 6, which calls for a list of claim numbers for denied claims . . . and a further supplemental response to FCE's Request for Production No. 16, which calls for copies of MCC's position letters for the claims identified in MCC's response to Interrogatory No. 6 . . . .  These requests seek information pertaining to FCE's bad faith pattern and practice claim only.  This issue has been bifurcated (D.E. 102).  MCC therefore submits that there is no associated prejudice caused by MCC's supplemental responses.

(*Id.* at 16.)

17

With respect to the Affidavits of Mr. Elwood and Mr. Jordan, Defendant asserts there are no false, misleading, or speculative statements. (*Id.* at 13-15.) As to the training materials requested by Plaintiff, Defendant appears to argue it was Plaintiff's responsibility to disclose the cases in which it was determined that Defendant maintained such materials. (*Id.* at 17.) While Defendant admits that the investigation of its employee, Mr. Chahalis, revealed such materials existed, which were later produced to Plaintiff, Defendant contends it did not generate the materials and therefore they were not responsive to Plaintiff's requests. (*Id.* at 18.) In regards to the documents referenced in *Signature Development, LLC v. Mid-Continent Casualty Company*, in which Mid-Continent "conceded that its parent company, Great American Insurance Group, does provide training to employees," Mid-Continent states:

> [T]he documents referenced by the *Signature* court are not attached to FCE's Motion as an exhibit. Second, a review of the *Signature* case reveals that it did not involve a storage tank owner policy claim and/or a claim involving pollution liability and environmental damage. . . . FCE has made no showing that the documents referenced in that case have any relevance to the issues in this matter. Furthermore, Great American Insurance Company is not a party to this action and FCE's discovery requests clearly do not request any materials from anyone other than MCC.

(*Id.*)

In addition, Defendant argues that there is no evidence of a pattern and practice of discovery violations because the Duval County case involving the same parties to which Plaintiff refers does not support a pattern and practice of

18

violations. (*Id.* at 19.) Defendant further argues that none of the sanctions sought would be justified because "there is no evidence whatsoever of any willful or bad faith conduct" and the "additional materials add nothing of substantive value" because they are "relevant only to FCE's pattern and practice claim, which has been bifurcated." (*Id.* at 19-20.)

### 3.   Plaintiff's Additional Arguments

In its Reply, Plaintiff states Defendant has not explained its failure to produce the 5,000 plus pages of documents that are not claim notes and the revised answers to interrogatories, which were provided months after the production of the claim notes and years after the discovery requests and court orders compelling production. (Doc. 162 at 1-2.) Plaintiff argues that the actions or omissions of both Defendant and its counsel amount to more than simple negligence. (*Id.* at 2.) Plaintiff explains:

> The magnitude alone of the volume of documents produced years after first requested and ordered (over 5,000 pages), evidences the fact that neither MCC nor its counsel conducted a reasonable inquiry into the existence of the discovery requested by FCE and ordered by the Court. The only evidence in the record as to what was done with respect to MCC's attempt to comply with discovery requests and court orders was given by Mr. Elwood at his deposition. Mr. Elwood was asked to gather documents that would be responsive to FCE's document request. . . . Mr. Elwood asked the IT department to put the claim file on a disc to send to counsel to redact, and to his understanding, this request would have included claim notes. He has no recollection of requesting home office files. Mr. Elwood conceded that while he may have "briefly" looked at whatever IT put on the disc he had requested, "there's no way that [he] went through each and every one and matched them." Moreover, the very affidavits

19

submitted by MCC in connection with its recent document production responses prove that no reasonable search of MCC's files was ever commenced prior to August and September of 2014.

(*Id.* at 4 (internal citations omitted).)   Plaintiff argues that this conduct amounts to

willful disregard of court orders and discovery obligations.  (*Id.* at 6.)

In response to Defendant's argument that the additional materials add

nothing of substantive value, Plaintiff states:

MCC had never before produced captioned reports showing that the **ONLY** reason for denial of FCE's claim was that MCC took the position that there was no evidence of a leak from FCE's underground storage tank system.  This evidence is very significant since the judge found in the underlying trial that evidence of a leak from FCE's underground storage tank system had been submitted to MCC in the form of a site check prior to denial of coverage.  There can be no clearer evidence that FCE's claim was denied in bad faith. These documents also belie the voluminous affirmative defenses filed by MCC in the underlying coverage action, as well as those asserted in this case.  Moreover, . . . no reserve history was included with the original file, no electronic claim notes, no captioned reports, and nothing showing how the claim was actually handled.  As the Supreme Court of Florida has confirmed, this evidence is critical to a bad faith claim.

(*Id.* at 7-8 (internal citations omitted) (emphasis in original).)  Plaintiff also points

out that despite its request that the documents be produced in their original form,

*i.e.*, the native electronic files format, the documents were not produced in this

manner.  (*Id.* at 9.)

In conclusion, Plaintiff states:

FCE has never had the opportunity to use the documents and interrogatory answers recently provided to develop strategy, engage experts, prepare testimony, conduct other discovery, or use in

depositions.  FCE has also incurred substantial costs and expenses associated with discovery, motions to compel, motions for sanctions, and depositions that will have to be repeated should a default judgment not be entered.  Sanctions are mandatory where MCC has not demonstrated that it was impossible to comply with the prior court orders.

(*Id.* at 10.)

## B.    Standard

Plaintiff's Renewed Motion for Sanctions is filed pursuant to Rule 37(c)(1) of

the Federal Rule of Civil Procedure, which provides:

If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.  In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
(B) may inform the jury of the party's failure; and
(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(I)-(vi).

Fed.R.Civ.P. 37(c)(1).

Rule 37(b)(2)(A) authorizes the following sanctions for failure to comply with

a discovery order:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
(iii) striking pleadings in whole or in part;
(iv) staying further proceedings until the order is obeyed;

21

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party[.].

Fed.R.Civ.P. 37(b)(2)(A).

"Rule 37 sanctions are intended to prevent unfair prejudice to the litigants and insure the integrity of the discovery process." *United States v. One 32' Scorpion Go-Fast Vessel*, 339 F. App'x 903, 905 (11th Cir. July 23, 2009) (per curiam) (quoting *Gratton v. Great Am. Commc'ns*, 178 F.3d 1373, 1374 (11th Cir. 1999) (per curiam)). "[C]ourts are given broad discretion in fashioning appropriate sanctions for violations of discovery orders." *Sussman v. Salem, Saxon & Nielsen, P.A.*, 154 F.R.D. 294, 298 (M.D. Fla. 1994).

"[T]he decision to dismiss a claim [or] . . . enter a default judgment[] ought to be a last resort—ordered only if noncompliance with discovery orders is due to willful or bad faith disregard for those orders," *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1556 (11th Cir. 1986),[7] and "when less drastic sanctions would not ensure compliance with the court's orders," *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1542 (11th Cir. 1993). Prejudice to the movant is a also relevant consideration in determining an appropriate sanction. *See Marcelle v. Am. Nat'l Delivery, Inc.*, 2010 WL 1655537, *3 n.4 (M.D. Fla. Apr. 23, 2010) ("While prejudice to the moving party is certainly a relevant consideration in determining

---

[7] "[O]nly in a case where the court imposes the most severe sanction—default or dismissal—is a finding of willfulness or bad faith failure to comply necessary." *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1049 (11th Cir. 1994).

whether a lesser sanction will suffice, the Court is not convinced that Eleventh Circuit precedent requires a showing of prejudice before a court can impose the sanction of default judgment or dismissal. . . . Because the Court agrees with the Magistrate Judge's finding that Defendant's conduct has prejudiced Plaintiff in this action, the Court need not resolve the question of whether a showing of prejudice is required.") (emphasis in original); *Carlucci v. Piper Aircraft Corp.*, 102 F.R.D. 472, 488 (S.D. Fla. 1984). *Cf. Inmuno Vital, Inc. v. Telemundo Group, Inc.*, 203 F.R.D. 561, 571 (S.D. Fla. 2001) (stating that "unlike lesser sanctions, imposition of a default judgment sanction requires that the district court first find (1) that the party exhibited a willful or bad faith failure to obey a discovery order; (2) that the moving party was prejudiced by that violation; and (3) that a lesser sanction would fail to punish the violation adequately and would not ensure future compliance with court orders.").

"[A] default sanction may be proper even when not preceded by the imposition of lesser sanctions. When lesser sanctions would be ineffective, Rule 37 does not require the vain gesture of first imposing those ineffective lesser sanctions." *Malautea*, 987 F.2d at 1544. The most severe sanctions, such as dismissal or default, "must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey League v. Metropolitan Hockey Club, Inc.*, 427

23

U.S. 639, 643 (1976) (per curiam).

"Violation of a discovery order caused by simple negligence, misunderstanding, or inability to comply will not justify a Rule 37 default judgment or dismissal." *Malautea*, 987 F.2d at 1542.  However, a party asserting an inability to comply must produce evidence in support of such claim, as mere assertion of inability will not do.  *Id.* at 1543.  To avoid sanctions under Rule 37, a party must show that it made all reasonable efforts to comply with the court order. *BankAtlantic*, 12 F.3d at 1050.

### C.    Analysis

The undersigned agrees with Plaintiff that entry of a default judgment is an appropriate sanction for Defendant's conduct in this case.  The discovery requests at issue—Plaintiff's *First* Request for Production and Plaintiff's *First* Set of Interrogatories—were served on Defendant on August 28, 2012.  However, it was not until late 2014 that Defendant finally produced thousands of pages of documents and disclosed hundreds of relevant claims.  Defendant's last production—its Tenth Supplemental Response to Plaintiff's First Request for Production and its Third Supplemental Verified Answers to Plaintiff's First Set of Interrogatories—took place after the instant Motion was filed and, more specifically, on December 17, 2014, the day that Defendant responded to the Motion.  Despite Plaintiff's inquiries whether all responsive discovery has been produced, several discovery motions and Court Orders compelling disclosure (*see*

Docs. 18, 54, 76, 129), Defendant falsely claimed that all responsive documents have been produced.  As Plaintiff states in its Reply:

> Counsel for MCC has repeatedly represented both in discovery responses and communications with FCE's counsel that all responsive documents have been produced, only for FCE to discover that is not the case. . . . Counsel for MCC also represented after the late production of the claim notes that Mr. Jack Jordan (MCC's branch manager) had "**reviewed everything and he found that only the electronic claims notes had not been produced**."  After this representation from MCC's counsel, 5,000 pages of additional documents were allegedly discovered and produced.  Counsel's actions are even more egregious when considered in light of the fact that the same counsel represented MCC in the underlying coverage action.  MCC's counsel certainly should have had knowledge that some of these documents existed since they had copies of them in their possession.

(Doc. 162 at 5 (internal citations omitted) (emphasis in original).)

Defendant's conduct here seems analogous to defendant's conduct in *Metropolitan Opera Association, Inc. v. Local 100, Hotel Employees & Restaurant Employees International Union*, where defense "counsel's repeated representations that all responsive documents had been produced . . . were made without any real reflection or concern for their obligations under the rules governing discovery and, in the absence of an adequate search for responsive documents, [hence] without a reasonable basis." 212 F.R.D. 178, 221-22 (S.D.N.Y. 2003). The court in *Metropolitan Opera* found it "[e]specially troubling, and of great weight in [the court's] decision to impose the most severe sanction" that defense "counsel's conduct was not merely negligent but was aggressively willful." *Id.* at

222.  The court explained:

> [Defense] counsel's repeated representations of full production were
> made in response to [plaintiff's] counsel's continuing high-decibel
> allegations of failure to make adequate inquiry and repeated
> demonstrations of incomplete compliance and non-compliance with
> discovery requests. . . . That, in response, [defense] counsel
> continually professed full compliance—falsely and, as confirmed by
> compliance discovery, without making a reasonable
> inquiry—constitutes such gross negligence as to rise to intentional
> misconduct.

*Id.* (citations omitted).

Similarly, here, the sheer number of supplemental responses and the

volume of documents produced after claiming that all responsive documents have

been produced, which turned out to be false, in the face of Plaintiff's inquiries and

statements that responsive documents did exist, as well as Orders compelling

production, indicates that Defendant made no reasonable inquiry to ensure that all

responsive documents have been produced and constitutes, at a minimum, gross

negligence rising to the level of bad faith.  Further, although the discovery requests

were served in August 2012, it was not until the Fall of 2014, after the court-

sanctioned depositions of Defendant's witnesses took place and after the close of

discovery, that Defendant apparently made an effort to locate further responsive

documents, resulting in the production of thousands of pages of documents.  It

appears that this eleventh-hour production was made only in an effort to avoid

sanctions, as Defendant's witnesses' depositions indicate that there was no

substantial justification for Defendant's failure to adequately respond to Plaintiff's

discovery at the outset of this matter.  *See Mutual Fed. Savings & Loan Ass'n v. Richards & Assocs., Inc.*, 872 F.2d 88, 94 (4th Cir. 1989) ("Even though the defendants may have made efforts to comply, the attempts were lastditch and only offered when it became crystal clear that they were going to lose the case unless they did something.").

For example, Mr. Jordan testified that he did not know why the electronic claim notes had not been produced at the outset of this matter, and stated that although the notes could not be put on a disc, it was possible to print them at the time that Plaintiff originally requested them in 2012.  Defendant's employee who was charged with responding to Plaintiff's discovery, Mr. Elwood, testified that he did not print the electronic claim notes, did not go through each item on the disc prepared by the IT department to make sure that all responsive documents were included, and did not look at the disc more than "briefly."  Mr. Elwood also testified that he did not reach out to the home office regarding any responsive documents and was not aware of any set procedure for responding to discovery in a lawsuit.

This testimony demonstrates that Defendant did not make any reasonable effort to respond to Plaintiff's requests for years after they were served.  *See Metropolitan Opera*, 212 F.R.D. at 221 (stating that a reasonable inquiry into the factual basis of a party's discovery responses "would have required, at a minimum, a reasonable procedure to distribute discovery requests to all employees and agents of the defendant potentially possessing responsive information, and to

account for the collection and subsequent production of the information to plaintiffs") (citations omitted).  Although Defendant supplemented its responses, as Plaintiff points out, "after ten supplemental responses to the initial request for production and three supplemental interrogatory answers, it is impossible for either FCE or the Court to ever be assured that MCC has finally produced all responsive documents and completely answered all interrogatories."  (Doc. 162 at 9.) Defendant's apparently disjointed searches resulting in a production of a few more documents each time after either being informed by Plaintiff that responsive documents did exist and/or being directed by the Court to produce them, shows lack of good faith and disregard for Defendant's discovery obligations.  *See Tarlton v. Cumberland Cnty. Correctional Facility*, 192 F.R.D. 165, 170 (D.N.J. 2000) ("The client is charged with knowledge of what documents it possesses.  It was not their option to simply react to plaintiff's fortuitous discovery of the existence of relevant documents by making disjointed searches, each time coming up with a few more documents, and each time representing that was all they had. Under the federal rules, the burden does not fall on plaintiff to learn whether, how and where defendant keeps relevant documents.").

Defendant continues to argue, as it did when opposing Plaintiff's first motion for sanctions, that any failure to respond to Plaintiff's discovery requests was inadvertent.  Defendant made this argument at the January 23, 2014 final pretrial conference, then again in its May 12, 2014 e-mail to Plaintiff's counsel, and in the

28

Affidavit of Jack Jordan.  However, as already shown, Mr. Jordan's subsequent deposition testimony does not support his earlier statement that Defendant's failure to produce the documents was inadvertent; instead, he testified that he did not know why the electronic claim notes had not been produced with Defendant's initial responses.

Moreover, even assuming that the initial failure to produce the documents and answer the interrogatories was inadvertent, the Court's May 15, 2013 Order gave Defendant yet another opportunity to diligently search for and produce any responsive documents and provide adequate answers, but even after that Order, Defendant still failed to do so.  On this record, "it seems more likely that Defendant simply chose to withhold relevant evidence[.]" *BankAtlantic*, 127 F.R.D. at 233. Therefore, the undersigned recommends that Defendant's willfulness in withholding the subject discovery despite Court Orders compelling disclosure, has been established.  *See Allstate Ins. Co. v. Awan & Assocs. P.C.*, 2013 WL 1340142, *5 (E.D. Mich. Apr. 3, 2013) (stating that "repeated noncompliance with court-sanctioned discovery requests suggests willfulness, bad faith, or fault").

In addition, Plaintiff has been prejudiced as a result of Defendant's conduct. First, as stated in the Court's July 17, 2014 Order on Plaintiff's previous motion for sanctions, when Plaintiff received Defendant's earlier supplemental responses, the discovery period had already closed and the trial term was only twenty days away. (Doc. 129 at 12.)  Although the Court subsequently extended the discovery period

to September 16, 2014, Defendant continued supplementing its responses beyond that date, providing thousands of pages of new information, regarding which Plaintiff could not seek further discovery.  As Plaintiff states: "FCE has never had the opportunity to use the documents and interrogatory answers recently provided to develop strategy, engage experts, prepare testimony, conduct other discovery, or use in depositions."  (Doc. 162 at 10.)   In addition, Plaintiff "has also incurred substantial costs and expenses associated with discovery, motions to compel, motions for sanctions, and depositions that will have to be repeated should a default judgment not be entered."  (*Id.*)  Plaintiff has also been prejudiced by the significant delay of moving this case to trial.  *See Carlucci*, 102 F.R.D. at 489.

If the Court were to reopen discovery instead of entering a default judgment, it would be rewarding Defendant for its dilatory conduct.  *See Inmuno Vital*, 203 F.R.D. at 573 ("While yet another continuance of this action might allow the parties to exchange the previously withheld discovery and conduct depositions on that discovery, a continuance is simply not a viable option.  Five continuances have been granted in this matter.  A sixth continuance would have inappropriately rewarded Defendants for the dilatory tactics described above.").  The Court has already extended the discovery period numerous times, has vacated case management deadlines, and has continued the trial in this case five times.  (*See, e.g.*, Docs. 28, 64, 72, 78, 95, 118, 123.)  Under these circumstances, the undersigned does not believe that another extension of the case management

deadlines will cure the prejudice to Plaintiff or ensure that all relevant discovery is produced.

Defendant's argument that there is no prejudice because Plaintiff has already been afforded the opportunity to conduct extensive discovery, misses the point. *See Tarlton*, 192 F.R.D. at 170 (rejecting defendants' argument that there is no harm now that they have answered all of plaintiff's discovery requests and explaining that plaintiff has been prejudiced by being forced to spend months learning about the existence, significance, and whereabouts of the discovery and repeatedly seeking the court's assistance, and that the "prejudice also extends to the court, for defendants' failure to identify relevant documents has hindered the efficient management of the pretrial process . . . and has delayed a resolution of this action on its merits"). Moreover, on this record, it is impossible to know whether Defendant has produced, or will ever produce, all discoverable information.

Further, as the Court has already stated in its July 17, 2014 Order, the relevance and importance of the claim notes that Plaintiff sought is undisputed. In addition, the supplemental information produced by Defendant is also relevant to Plaintiff's case. Defendant argues that no prejudice was caused by its supplemental responses because they pertain only to Plaintiff's bad faith pattern and practice claim, which has been bifurcated. However, as explained in Plaintiff's Reply, the supplemental information is clearly relevant to Plaintiff's bad faith claim

31

because:

> MCC had never before produced captioned reports showing that the
> **ONLY** reason for denial of FCE's claim was that MCC took the
> position that there was no evidence of a leak from FCE's
> underground storage tank system.  This evidence is very significant
> since the judge found in the underlying trial that evidence of a leak
> from FCE's underground storage tank system had been submitted to
> MCC in the form of a site check prior to denial of coverage. . . .
> These documents also belie the voluminous affirmative defenses filed
> by MCC in the underlying coverage action, as well as those asserted
> in this case.  Moreover, as stated by Mr. Norris,[8] no reserve history
> was included with the original file, no electronic claim notes, no
> captioned reports, and nothing showing how the claim was actually
> handled.  As the Supreme Court of Florida has confirmed, this
> evidence is critical to a bad faith claim.

(Doc. 162 at 7-8 (internal citations omitted) (emphasis in original); *see also* Doc.

162-8.)

In addition, to the extent Defendant argues that Plaintiff has not been

prejudiced by Defendant's failure to produce its training materials because it was

Plaintiff's responsibility to disclose the cases in which it was determined that such

materials existed, this argument is rejected.  It was not Plaintiff's responsibility to

conduct independent research for responsive documents, which ultimately

revealed the existence of training materials.  *See BankAtlantic*, 127 F.R.D. at 234

("It is not within Defendant's prerogative to complain that Plaintiff might have

---

[8] Thomas J. Norris is Plaintiff's expert whose fifteen-page expert report provides in part that the initial file materials provided by Defendant "were an incomplete and unorganized record of the handling of the claim," and that "[b]ad faith claim handling occurred in this case before the claim was denied, when it was denied, and afterwards in the continued handling of the claim."  (Doc. 162-7 at 2, 6.)

secured the documents from some other source. . . . Negligence by Plaintiff cannot erase willful misconduct by Defendant in defiance of a court order.").

Based on the foregoing, the undersigned does not believe that lesser sanctions would ensure compliance with the Court's Orders.  Apparently, this is not the first case in which MCC has failed to produce responsive documents.  *See First Coast Energy, L.L.P. v. Mid-Continent Cas. Co.*, Case No. 16-2006-CA-1584, *26-32 (Fla. Cir. Ct. June 14, 2012).  Moreover, MCC has already been sanctioned in this case (*see* Doc. 129), and had notice that depending on its subsequent conduct, Plaintiff could seek further sanctions (*see* Docs. 141, 143).  In fact, lesser sanctions have already proven ineffective given that Defendant has failed to provide all responsive documents even after the Court's Order on Plaintiff's previous motion for sanctions.  Further, as stated by the court in *Metropolitan Opera*, a lesser sanction would be "insufficient to restore the evidentiary balance because it is impossible to know what [plaintiff] would have found if [defendant] and its counsel had complied with their discovery obligations from the commencement of the action."  212 F.R.D. at 230 (internal citations and quotation marks omitted).  Because the undersigned believes that lesser sanctions would not change Defendant's behavior and would neither punish Defendant for its discovery failures in this case nor deter other parties contemplating a similar course of action, it is recommended that a default judgment be entered against Defendant, pursuant to Fed.R.Civ.P. 37(b)(2)(A), on liability with respect to

33

Plaintiff's traditional first-party bad faith claim.[9]  The case should proceed for a determination of the issue of damages and Plaintiff's pattern and practice claim.

Accordingly, it is respectfully **RECOMMENDED** that the Renewed Motion for Sanctions (**Doc. 145**) be **GRANTED**, that Defendant's Answer and Affirmative Defenses (Doc. 4) be **STRICKEN in part**, and that a default judgment be entered against Defendant, pursuant to Fed.R.Civ.P. 37(b)(2)(A), on liability with respect to Plaintiff's traditional first-party bad faith claim.

**DONE AND ENTERED** at Jacksonville, Florida, on March 2, 2015.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

The Honorable Timothy J. Corrigan
United States District Judge

Counsel of Record

---

[9] On March 24, 2014, the Court entered an Order *sua sponte* bifurcating the proceedings, stating that the Court would try the traditional first-party bad faith claim first, and then, if necessary, the pattern and practice claim.  (Doc. 102.)